IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NORTH DAKOTA

| | | |
|---|---|---|
| In re: | ) | Case No. 23-30132 |
| | ) | (Chapter 11) |
| CHRISTOPHER WAYNE GLENN | ) | |
| | ) | |
| Debtor. | ) | |

**REPLY TO JPMORGAN CHASE BANK, N.A. S/B/M/T CHASE BANK USA, N.A.'s RESPONSE IN OPPOSITION TO DEBTOR'S OBJECTION TO CLAIMS #2 AND #3**

Comes now Christopher Wayne Glenn ("Mr. Glenn" or the "Debtor"), by and through undersigned counsel, in reply to the opposition (the "Opposition," as found at DE #61) filed by JPMorgan Chase Bank, N.A. ("JPMorgan"), concerning Mr. Glenn's underlying objection (the "Objection," as found at DE #42) to two of the three claims filed by JPMorgan (the "Claims"),[1] and in support thereof states as follows:

I.   **Introduction**

There are two legal issues instantly manifest, one being technical and the other being substantive. The former concerns whether or not the Claims comply with the rigors of the Federal Rules of Bankruptcy Procedure, inasmuch as the Claims appear to be premised upon writings but do not attach any such writings. The latter concerns whether Mr. Glenn can be legally deemed to have personally guaranteed debts of his former employer by virtue of (i) having furnished his Social Security number – alongside his employer's taxpayer identification number – when applying for credit cards; and/or (ii) having the card issuer rely upon unilateral – and uncommunicated – terms and conditions that putatively impose personal liability.

---

[1] The Objection is part of an omnibus objection that addresses, too, the claims of unrelated creditors. None of those unrelated creditors have timely opposed the objection to their respective claims. This reply brief is accordingly limited to the Claims of JPMorgan, and does not address the other claims subsumed within the Objection. Similarly, and as noted in the Objection, Mr. Glenn did not object to one of the three claims filed by JPMorgan, *see* Objection, DE #42, at n. 1, and this brief accordingly does not address that singular claim either.

1

While both issues are addressed herein, it is no doubt the second point that ultimately merits the greater attention. Though Mr. Glenn does believe the Claims to remain facially invalid for want of inclusion of accompanying writings, he is equally aware that simple amendment could likely cure that issue. By contrast, however, the writings that would be attached do not appear to be documents that conform to governing rigors requisite to impose guarantor liability (or direct liability) on Mr. Glenn. And that substantive issue is accordingly the one most likely to prove dispositive *sub judice*.

## II.   Relevant Facts

Mr. Glenn reasonably anticipates that evidence adduced at a hearing on the Objection will reveal the following facts:

1. At some point in time, Mr. Glenn contacted JPMorgan, by telephone, and applied for a corporate credit card for Silver Fox Energy Corp. ("Silver Fox Corp."), with Mr. Glenn to be indicated thereupon as the authorized signor – and holder – of the card.

2. At some other point in time, Mr. Glenn similarly contacted JPMorgan by telephone and made a comparable application for a corporate credit card for Silver Fox Energy LLC ("Silver Fox LLC"), with Mr. Glenn again being indicated as the authorized signor – and holder – of the card.

3. In making both applications, Mr. Glenn furnished JPMorgan with the federal employer identification number for the respective entity (Silver Fox Corp. and Silver Fox LLC), together with information about the entities (name, address, annual revenue, etc.).

4. During the application process, Mr. Glenn was asked for his own name and Social Security number, which he provided on both occasions.

2

5. No written application was ever presented to Mr. Glenn for review, and no written application was ever signed by Mr. Glenn.

6. JPMorgan issued both cards as corporate credit cards, indicating thereupon that Mr. Glenn is the named user of each card.

7. While JPMorgan points to "card member agreements" (the "Business Card Agreements") in its brief, *see* Opposition, DE #61, at ¶ 9, there is no evidence of such agreements ever being sent to Mr. Glenn and, to the contrary, Mr. Glenn does not recollect ever receiving such agreements, much less having occasion to review such agreements, at any time prior to the Opposition being docketed in this case.

8. The Business Card Agreements are 31 pages long, are titled "Your Business Card Agreement," define "you" on the 11th page in a manner that is inclusive of the individual who applied for the account, and then provide, *inter alia*, "You are legally obligated to pay for all purchases, cash advances, and all fees and charges incurred on the account, from the opening of the account." *See* Your Business Card Agreement, DE #61-1 at p. 13.

9. Mr. Glenn never acknowledged receipt of the Business Card Agreements (as noted *supra*, he does not believe he received them at all), never signed any acknowledgement of receipt, and never signed a document acquiescing to their terms.

10. Mr. Glenn always understood the charges on the two subject cards to be obligations of Silver Fox Corp. and Silver Fox LLC, respectively, used the cards for corporate purposes, and never undertook any purchases with a belief he would be personally liable for the same.

### III. Argument: There is No Enforceable Guaranty or Other Personal Liability

This case presents a somewhat novel construct, inasmuch as there is no dispute but that Mr. Glenn applied for two corporate credit cards and, likewise, there is no dispute but that those

3

cards were used for corporate purposes. Had the cards been personal in nature, the formality of a signature or meeting of the minds would be largely immaterial, inasmuch as there would exist a claim for quantum meruit recovery, or the potential for assertion of an "account stated" cause of action. Similarly, if the debtor herein were Mr. Glenn's former employer, a similar analysis would apply, with there being little question as to ultimate liability (albeit, perhaps, some question as to the proper vehicle for assessing such liability). Yet neither such scenario is instantly manifest, with JPMorgan instead endeavoring to establish guarantor liability (or direct liability) on the part of Mr. Glenn, and endeavoring to do so without a signed guaranty and, equally, without any documentation that evidences so much as a meeting of the minds. In light of these issues, it is appropriate to sustain the Objection and disallow the Claims.

Under North Dakota law, "The consent of the parties to a contract must be: 1. Free; 2. Mutual; and 3. Communicated by each to the other." N.D. Cent. Code § 9-03-01.[2] Indeed, "[t]o make a contract valid, the minds of the parties thereto should meet." *Waldron v. Evans*, 46 N.W. 607, 607 (Dakota 1867).

Equally, whether the Business Card Agreements seek to create direct joint liability, or a guarantee of payment, is legally immaterial because "[g]uaranties are to be construed the same as other contracts." *Am. Bank Ctr. v. Barker*, 2018 WL 1701358, at *7 (D. N.D. 2018) (citing *First Int'l Bank & Tr. v. Peterson*, 776 N.W.2d 543 (N.D. 2009)).

---

[2] The Business Card Agreements purport to be governed by "federal law, as well as the law of Delaware…" *See* Your Business Card Agreement, DE #61-1 at p. 14. The application of Delaware law, however, is essentially a chicken/egg issue in this case; this Honorable Court would have to find that Mr. Glenn entered into the "card member agreements" to, in turn, find that he agreed to be bound by Delaware law. If Mr. Glenn is found to be a party to the agreement, the application of Delaware law versus North Dakota law will become largely immaterial.

4

Here, there is neither mutuality nor communication "by each to the other." To the contrary, Mr. Glenn never received the Business Card Agreements, much less reviewed them and agreed to be bound by them. At best, they were mailed to him and disposed of as having the imprimatur of junk mail. At worst, they were never sent. Under either scenario, however, it cannot be said a meeting of the minds was achieved and, as such, there cannot be a legally enforceable contractual obligation.

The issue instantly presented is analogous to the question confronted by courts in cases where a computer end-user is asked to acquiesce to certain terms of service (with limitations on damages and provisions for the utilization of arbitration often being the most material provisions in the context of later-commenced litigation). As explained by one federal court:

> On the internet, the primary means of forming a contract are the so-called "clickwrap" (or "click-through") agreements, in which website users typically click an "I agree" box after being presented with a list of terms and conditions of use, and the "browsewrap" agreements, where website terms and conditions of use are posted on the website typically as a hyperlink at the bottom of the screen. Unlike a clickwrap agreement, a browsewrap agreement "does not require the user to manifest assent to the terms and conditions expressly ... [a] party instead gives his assent simply by using the website." In ruling upon the validity of a browsewrap agreement, courts consider primarily "whether a website user has actual or constructive knowledge of a site's terms and conditions prior to using the site."

*Hines v. Overstock.com, Inc.*, 668 F. Supp. 2d 362, 366–67 (E.D.N.Y. 2009), aff'd, 380 Fed. Appx. 22 (2d Cir. 2010) (citing *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 428–30 (2d Cir. 2004); quoting *Southwest Airlines Co. v. BoardFirst, L.L.C.*, 2007 WL 4823761 at *4 (N.D. Tex. 2007); citing *Specht v. Netscape Communications Corp.*, 306 F.3d 17, 20 (2d Cir. 2002)).

As noted by then-Circuit Judge Sotomayor in the *Specht* case, both knowing and affirmative action is required for someone to be bound to the terms of a contract:

> Although an onlooker observing the disputed transactions in this case would have seen each of the user plaintiffs click on the SmartDownload "Download" button, a consumer's clicking on a download button does not communicate assent to

5

> contractual terms if the offer did not make clear to the consumer that clicking on the download button would signify assent to those terms.

*Specht*, 306 F.3d at 29–30 (citing *Cedars Sinai Med. Ctr. v. Mid–West Nat'l Life Ins. Co.*, 118 F.Supp.2d 1002, 1008 (C.D.Cal.2000); *Windsor Mills, Inc. v. Collins & Aikman Corp.*, 101 Cal.Rptr. 347, 351 (Cal. App. 3d 1972)

The situation here is analogous inasmuch as JPMorgan might have sent Mr. Glenn the Business Card Agreements – just like a web operator might have made terms of service available for perusal through posting a link on a given website. But that does not mean Mr. Glenn ever received, opened, or read the Business Card Application, just as it does not mean a web user ever clicked the link, loaded the terms of service, and proceeded to read them. JPMorgan could have asked Mr. Glenn to sign a cardholder agreement – tantamount to a website asking its users to click an acknowledgement of acquiescence to terms of service. But JPMorgan did not. And just as a web user is not bound by terms of service accessible through an unclicked link, Mr. Glenn is not liable under the terms of the Business Card Agreements that might have been accessible had he (i) received them; (ii) opened them; and (iii) read them.

There is, no doubt, a slightly unusual confluence of events in this case. As noted *supra*, a cardholder's formal agreement is normally of negligible consequence, since non-contractual legal theories require an individual card user to pay charges s/he incurs on a personal credit card. Similarly, the bankruptcy of an individual user of a corporate card is ordinarily of no consequence since the corporate entity remains solvent and simply pays its authorized signatories' corporate credit card bills in the ordinary course of business. But here there is a company that has been committed to receivership within weeks of the subject employee petitioning for Chapter 11 relief; the manner in which the Business Card Agreements were presented, *vel non*, is suddenly enormously relevant and legally determinative.

6

JPMorgan is, of course, welcome to file a claim against the receivership estate of Silver Fox. And Mr. Glenn has not objected to one of the three claims filed by JPMorgan herein, which will be paid at 100 cents on the dollar pursuant to the terms of Mr. Glenn's plan of reorganization (assuming that plan is confirmed). But the Claims instantly at issue are simply not legally cognizable in nature. And it is thusly appropriate to sustain the Objection.

### IV. Argument: The Claims are Without Supporting Documentation

Finally, on a more technical level, it bears notation that JPMorgan has not amended the Claims and, as such, they are still bereft of the supporting documentation mandated by Federal Rule of Bankruptcy Procedure 3001(c)(1). While this is a fixable issue, it is nonetheless an issue. And unless and until JPMorgan amends its Claims, the aforementioned rule militates in favor of sustaining the Objection.

There does not appear to be a dispute but that "when a claim … is based on a writing, a copy of the writing shall be filed with the proof of claim. If the writing has been lost or destroyed, a statement of the circumstances of the loss or destruction shall be filed with the claim." Fed. R. Bankr. P. 3001(c)(1). The dispute, rather, stems from the foregoing mandate being facially inapplicable to "open-end or revolving consumer credit agreement(s)," Fed. R. Bankr. P. 3001(c)(3), and JPMorgan maintaining these were consumer agreements.

The Opposition specifically asserts, *inter alia*, "Debtor has not provided facts or evidence to distinguish that the debts are not consumer debts and Chase thereby demands proof thereof." Opposition, DE #61, at ¶ 8.

This contention is difficult to credit. JPMorgan is, at the same time, (a) insisting there is no evidence that the "debts are not consumer" in nature, and (b) relying on a document titled "Your Business Card Agreement." Familiarly, "The term 'consumer debt' means debt incurred by an

7

individual primarily for a personal, family, or household purpose." 11 U.S.C. § 101(8). And "[a] guaranty of a business debt is generally not a consumer debt." *In re Grillot*, 578 B.R. 651, 652 (Bankr. D. Kan. 2017).

Pointedly, if the subject credit card obligations are of a consumer variety, JPMorgan's methodology of sending an agreement *after* issuing a credit card, and doing so under separate cover, may well be a "deceptive act" forbade by North Dakota law. N.D. Cent. Code § 51-15-02. But the card obligations are not of a consumer variety and, as such, the consumer protection laws have no place here – just as the safe harbor of Federal Rule of Bankruptcy Procedure 3001(c)(3) has no place here.

JPMorgan filed improper proofs of claim. The rules require a writing be appended thereto and, for one reason or another, no such writing can be found annexed to either of the Claims. This is not an incurable defect, but it is a defect nonetheless. *See, e.g.*, *In re Parker*, 2022 WL 17591603, at *5 (Bankr. W.D. Tenn. 2022) ("Neither the Bankruptcy Code nor the Federal Rules of Bankruptcy Procedure impose a deadline for amending proofs of claim. Generally, creditors may amend their timely filed proofs of claim."). Unless and until this defect is remedied, the failure furnishes a second, independent basis for sustaining the Objection.

### V. Conclusion

WHEREFORE, the Debtor respectfully prays this Honorable Court (i) disallow the Claims; and (ii) afford such other and further relief as may be just and proper.

*[Signature and Certificate of Service on Following Page]*

                                            Respectfully submitted,

Dated: August 10, 2023        By:    /s/ Maurice B. VerStandig
                                                          Maurice B. VerStandig, Esq.
                                                          The Dakota Bankruptcy Firm
                                                          1630 1st Avenue N
                                                          Suite B PMB 24
                                                          Fargo, North Dakota 58102-4246
                                                          Phone: (701) 394-3215
                                                          mac@dakotabankruptcy.com
                                                          *Counsel for the Debtor*

## **CERTIFICATE OF SERVICE**

      I HEREBY CERTIFY that on this 10th day of August, 2023, a copy of the foregoing was served electronically upon filing via the ECF system, with copies being thereby sent to:

| | |
|---|---|
| Sarah J. Wencil, Esq.<br>Office of the U.S. Trustee<br>Suite 1015 U.S. Courthouse<br>300 South Fourth Street<br>Minneapolis, Minnesota 55415<br>sarah.j.wencil@usdoj.gov<br>*Counsel for the US Trustee* | Katelyn Krabbenhoft, Esq.<br>HALLIDAY, WATKINS & MANN, P.C.<br>376 East 400 South, Suite 300<br>Salt Lake City, Utah 84111<br>*Counsel for Wells Fargo Bank, N.A.* |
| Thomas Kapusta, Esq.<br>P.O. Box 90624<br>Sioux Falls, South Dakota 57109<br>tkapusta@aol.com<br>*Subchapter V Trustee* | John M. Krings, Jr., Esq.<br>Kaler Doeling, PLLP<br>3429 Interstate Boulevard South<br>PO Box 9231<br>Fargo, North Dakota 58106-9231<br>*Counsel for Lighthouse Management Group Inc.* |
| Douglas W. Murch, Esq.<br>CONMY FESTE LTD.<br>P.O. Box 2686<br>Fargo, North Dakota 58108-2686<br>dmurch@conmylaw.com<br>*Counsel for Ford Motor Credit Company LLC* | Kathryn A. Klein, Esq.<br>Riezman Berger, P.C.<br>7700 Bonhomme Avenue, 7th Floor<br>St. Louis, Missouri 63105<br>*Counsel for JPMorgan Chase Bank, N.A.* |

                                                          /s/ Maurice B. VerStandig
                                                          Maurice B. VerStandig