IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NORTH DAKOTA

| | | |
|---|---|---|
| In re: | ) | Case No. 23-30132 |
| | ) | (Chapter 11) |
| CHRISTOPHER WAYNE GLENN | ) | |
| | ) | |
| Debtor. | ) | |

## CHRISTOPHER WAYNE GLENN'S SECOND AMENDED SUBCHAPTER V PLAN OF REORGANIZATION

Comes now Christopher Wayne Glenn ("Mr. Glenn" or the "Debtor"), by and through undersigned counsel, pursuant to the rigors of Official Form 425A, and provides the following amended plan of reorganization (the "Plan") herein:

**Background for Cases Filed Under Subchapter V**

a. **Description and History of the Debtor's Business**

Mr. Glenn is a native of Delaware and proud alumnus of The Pennsylvania State University. After college, he found his way to North Dakota where he pursued work in the oil and gas industry. This ultimately led to his founding of Silver Fox Energy ("Silver Fox"), an infrastructure entity solely owned by the Debtor and his non-filing spouse until the close of 2021.

At the end of 2021, Mr. Glenn and his wife permitted the majority – but not whole – of their interests in Silver Fox to be diluted in favor of a third party private equity firm. The transaction was aimed at infusing the entity with cash and permitting strategic growth, while also allowing for imposition of a more nuanced managerial structure. As part of the deal, Silver Fox agreed to expend best efforts to relieve Mr. Glenn of any guarantees of company debt.

Unfortunately, few of these objectives were actually accomplished. Shortly after this case was filed, Silver Fox was committed to receivership by the Hennepin County District Court. It appears Silver Fox's new controlling ownership proved a less-than-stellar steward of the entity and undertook few, if any, steps to relieve Mr. Glenn of his liabilities on corporate debts. And so, with the prosper of a receivership then-pending, and in recognition that a liquidation of Silver Fox would invite substantial changes in his life, Mr. Glenn elected to seek Chapter 11 protection on April 24, 2023.

The design of this case is – and always has been – focused on ensuring Mr. Glenn is not burdened by extant guarantees of corporate debt as he sets about creating a new life. In preparing this case for filing, though, it was discovered that Mr. Glenn is also obligated on a series of judgments from the State of Delaware, dating back approximately 15 years, which all owe to a previous family business helmed by the Debtor's father. These were not obligations of which Mr. Glenn was knowledgeable as recently as April 1, 2023, and there does not appear to have been any effort to collect on these debts at any point in time of even vaguely-recent vintage. But, upon their discovery, this bankruptcy also took on the added goal of relieving the Debtor from these aged obligations.

1

To be sure, Mr. Glenn does, too, have ordinary consumer liabilities. And while not a driving force behind his petitioning for bankruptcy relief, these debts have been carefully scheduled herein. As noted *infra*, Mr. Glenn does not endeavor to use this case to relieve himself of the mortgages on the two properties he owns, nor of the lien on his car. But, in recognition of the comprehensive nature of this Plan, and consistent with controlling law, Mr. Glenn does provide treatment for all of his secured and unsecured debts – even those of a consumer variety – herein.

During the pendency of this case, Mr. Glenn was relieved of his job with Silver Fox. This came as little surprise, in light of the receivership proceedings and impending liquidation. But it has, too, created a paradigm whereby the Debtor is now confronted with beginning the new life he has long known to be coming. This plan is proposed not merely in concert with that new beginning but, too, as a guide for that new beginning. Mr. Glenn is confident in his ability to secure work and compensation for his skilled services; this Plan is offered to memorialize the portion of that compensation that will be paid over to his creditor base and the terms on which such payments will be made.

b. **Liquidation Analysis**

To confirm the Plan, the Court must find that all creditors and equity interest holders who do not accept the Plan will receive at least as much under the Plan as such claim and equity interest holders would receive in a Chapter 7 liquidation. Inasmuch as this Plan anticipates payment of all allowed claims in full, and no creditor could receive more than 100% of their respective claim in Chapter 7, no liquidation analysis is instantly necessary.

However, to the extent a liquidation analysis is required, the Debtor submits that a Chapter 7 trustee would endeavor to sell the Debtor's non-exempt assets to one or more third parties. In such an eventuality, (i) a Chapter 7 trustee would incur significant fees and expenses between the engagement of legal counsel and the incursion of commissions; and (ii) the Debtor would incur significant additional legal fees owing to its general reorganization counsel in connection with likely-protracted and complex proceedings correlative to any effort to convert this case to a proceeding under Chapter 7.

The foregoing notwithstanding, it appears that a liquidation of the Debtor's assets, even if somehow unburdened by legal fees and a trustee's commission, would fetch only $284,557.56, which is less than the sum proposed to be paid hereunder. This calculation is arrived at by valuing the Debtor's assets, assessing their relevant liens, and subtracting the value of exemptions invoked by Mr. Glenn, as follows:

| Asset | Value | Lien | Exemption | Net |
|---|---:|---:|---:|---:|
| 12548 24th St., Watford City, MD 58854 | $852,040.00 | $619,218.00 | $100,000.00 | $132,822.00 |
| 933 E. Ivy Street, Hanford, CA 93230 | $191,923.00 | $109,745.45 | $0.00 | $82,177.55 |
| Cadillac Escalade (leased) | $0.00 | $0.00 | $0.00 | $0.00 |
| Ford F-250 | $60,461.00 | $60,461.00 | $0.00 | $0.00 |

2

| | | | | |
|---|---|---|---|---|
| Household Goods and Furnishings | $19,500.00 | $0.00 | $8,000.00 | $11,500.00 |
| Electronics | $1,750.00 | $0.00 | $0.00 | $1,750.00 |
| Firearms | $5,000.00 | $0.00 | $0.00 | $5,000.00 |
| Clothing | $500.00 | $0.00 | $500.00 | $0.00 |
| Jewelry | $300.00 | $0.00 | $0.00 | $300.00 |
| Non-Farm Animals | $5.00 | $0.00 | $0.00 | $5.00 |
| Cash | $300.00 | $0.00 | $0.00 | $300.00 |
| Deposits of Money | $21,500.00 | $0.00 | $0.00 | $21,500.00 |
| Investment Account | $2,000.00 | $0.00 | $0.00 | $2,000.00 |
| Privately Held Entity Interests | $14,700.01 | $0.00 | $0.00 | $14,700.01 |
| Cryptocurrency | $10,000.00 | $0.00 | $0.00 | $10,000.00 |
| Loans to Others (accounts receivable) | $1.00 | $0.00 | $0.00 | $1.00 |
| Claim Against Silver Fox | $1.00 | $0.00 | $0.00 | $1.00 |
| Wage Claim Against Silver Fox | $1.00 | $0.00 | $0.00 | $1.00 |
| Riding Mower | $2,500.00 | $0.00 | $0.00 | $2,500.00 |
| | | | | |
| **Total** | **$1,182,482.01** | **$789,424.45** | **$108,500.00** | **$284,557.56** |

    **c. Ability to Make Future Plan Payments and Operate Without Further Reorganization**

The Debtor must also show that he will have enough cash over the life of the Plan to make the required Plan payments. The Debtor projects that he will continue to have income of $150,000.00 per annum for the next five years. This projection is based upon (i) the monies he believes he can earn by accepting a job with a third party company; (ii) the income he can receive, in the interim, working for Glenn LLC – an entity owned by the Debtor and his non-filing spouse; and (iii) distributions from Glenn LLC that may become available to the Debtor without regard to his employment with that entity.

Subtracting taxes and reasonable insurance expenses likely to be withheld from wages of $150,000.00 per annum, the Debtor believes his monthly take-home pay will be $9,238.14. This number is arrived at using Schedule I, found at Docket Entry #1 in this case, which shows the breakdown of the Debtor's then-current wages at the same income level. It may be that a new job will permit better – or worse – health insurance and, as such, a higher – or lower – withholding of wages for the payment of insurance premiums. And this number is accordingly somewhat speculative in nature. But based on currently available information, this is the most accurate income projection the Debtor can offer.

Net income of $9,238.14 per month will afford the Debtor annual take-home income of $110,857.68 during the life of this Plan. The Debtor also believes that so long as his wife – who, as noted *supra*, has been separated from her employment – is working with Glenn LLC on a full-time or near-full time basis, the entity should be able to distribute $6,000.00 to $7,000.00 per month to the Debtor, over and above wages garnered by his wife.

The Debtor is aware that he cannot continue to incur expenses in the manner set forth on his Schedule J and, to the contrary, is consciously endeavoring to lessen his spending in certain areas. This effort is somewhat complicated by virtue of the fact that the Debtor's non-filing spouse, who formerly contributed an identical income to the household, has also lost her job with Silver Fox. The effort is aided, however, by the income his wife has been able to realize from Glenn LLC, through her work with that entity.

In the interests of achieving a 100% plan – or as close thereto as possible – the Debtor is committing to making quarterly payments of $15,000.00 to creditors herein, for a period of five years, while also making a one-time payment of $20,615.94 – over and above normal plan payments – to the Internal Revenue Service, on December 1, 2027, should the claim of the Internal Revenue Service not be reduced prior to that date.[1] This will require the Debtor to expend no more than $4,238.14 of his take home wages per month, though he will be able to look to his non-filing spouse to make ongoing contributions to household expenses (including the mortgage and vehicle payments provided for herein) and, as discussed above, he believes he will be able to realize additional income through his equity interest in Glenn LLC (even if he is not working for that entity as a salaried employee). He will also continue to make regular installment payments to his secured creditors, over and above the $15,000.00 per quarter.[2] This will permit the Debtor to stay current on all secured obligations while making a pool of up to $320,615.94 available for distribution to administrative and general unsecured creditors (including priority creditors).[3]

---

[1] There are various means through which the Debtor may procure the funds to make this one time payment, including through the accumulation of equity distributions from Glenn LLC. The date of this payment is scheduled so as to be (i) within five years of the petition date; and (ii) far enough out to allow the Debtor to accumulate a reserve of money to make this payment, should the need so arise.

[2] As noted below, Lund Oil, Inc. is being paid through regular plan contributions and, as such, will not receive installment payments from the Debtor over and above the $15,000.00 per quarter but, rather, will be paid from that $15,000.00 per quarter.

[3] The phrase "up to" is used solely because a number of claim objections are currently pending and, should such objections be sustained and/or the claim of the Internal Revenue Service reduced, this Plan may be overfunded. Should the Debtor retire, in full, all allowed claims in this case – excepting secured claims on which he will continue paying in accord with the terms of security agreements – he will then cease making payments under this Plan. The escheat clause set forth *infra* is not intended to create a binding obligation for the Debtor to pay any monies over and above those due to creditors herein.

4

These figures show that the Debtor will have projected disposable income (as defined in § 1191(d) of the Bankruptcy Code [as defined below]), remaining after the payment of administrative expenses addressed below, for the period in § 1191(c)(2).

**You should consult with your accountant or other financial advisor if you have any questions pertaining to these projections.**

**Article 1.    Summary**

This Plan under chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") proposes to pay creditors of the Debtor from the general cash flow of the Debtor.

The Plan provides for:   3 classes of secured claims;

2 classes of non-priority, unsecured claims; and

1 class of an equity holder.

Non-priority unsecured creditors holding allowed claims will receive distributions, which the proponent of this Plan has valued at approximately 100 cents on the dollar, though such distribution may be less if the Debtor does not succeed in connection with certain claim objections and/or in connection with efforts to have the claim of the Internal Revenue Service reduced. The Plan also provides for the payment of administrative and priority claims.

**Your rights may be affected. You should read these papers carefully and discuss them with your attorney, if you have one. (If you do not have an attorney, you may wish to consult one.)**

**Article 2.    Classification of Claims and Interests**

| | | |
|---|---|---|
| **Section 2.01** | **Class 1** | The secured claims of Wells Fargo Bank, N.A. and First International Bank & Trust |
| **Section 2.02** | **Class 2** | The secured claim of Ford Motor Credit Company LLC |
| **Section 2.03** | **Class 3** | The claim of ACAR Leasing LTD d/b/a GM Financial Leasing |
| **Section 2.04** | **Class 4** | Non-priority, unsecured claims, excepting those expressly included in Class 3 (ACAR Leasing LTD d/b/a GM Financial Leasing) |
| **Section 2.05** | **Class 5** | The claim of Lund Oil, Inc. |
| **Section 2.06** | **Class 6** | Equity interests in the Debtor |
| **Section 2.07** | **Class Identification** | A schedule of each class and its constituent creditors is appended hereto as **Exhibit A.** The total size of the non-disputed claims (or, where applicable, the non-disputed portion of claims) in each class is as follows: |

5

        Class 1: $728,963.45 (being fully secured)

        Class 2: $66,942.55 (being fully secured)

        Class 3: $23,006.42 (being unsecured)

        Class 4: $109,776.58 (being unsecured)

        Class 5: $65,000 (being secured)

The total undisputed secured claims (and no secured claim is subject to dispute) total $860,906.00. The total undisputed unsecured claims, including the non-classified claim of the Internal Revenue Service, total $253,398.94.[4]

### Article 3. Treatment of Administrative Expense Claims and Court

**Section 3.01**   **Unclassified Claims**    Under § 1123(a)(1) of the Bankruptcy Code, certain administrative expense claims are not in classes.

**Section 3.02**   **Administrative Expense Claims**    Each holder of an administrative expense claim allowed under § 503 of the Bankruptcy Code will be paid in full on the effective date of this Plan, in cash, or upon such other terms as may be agreed upon by the holder of the claim and the Debtor. All professionals including the Debtor's counsel and the Subchapter V Trustee will need to file applications with the Court to seek approval of their fee and expenses as allowed administrative expense claims within 30 days of the Effective Date. Any allowed administrative expense claim will be paid directly by the Debtor within five (5) business days of an order allowing such claim becoming a final order. Any such claims paid by the Debtor prior to his first scheduled ordinary payment under this Plan shall be a credit against said payment.

**Section 3.03**   **Priority Tax Claims**    Each holder of a priority tax claim will be paid in full not later than April 23, 2028.

---

[4] As noted *infra*, the Debtor anticipates the claim of the Internal Revenue Service will decrease. This claim has not yet been disputed and, as such, is counted as "undisputed" for purposes of these calculations.

The only priority creditor herein, excepting administrative claimants, is the Internal Revenue Service (the "IRS"), which has filed a claim for $131,746.96, of which $120,615.94 is designated as being priority in nature. Of the priority portion of this claim, $52,304.00 stems from estimated taxes for 2021 and 2022. The Debtor cannot presently file taxes for those years because Silver Fox is yet to issue forms K-1 for those years, with it being the reasonable expectation of the Debtor that such forms K-1 will invite the incursion of losses that will mitigate much – if not all – of his tax liability for those years. Once such taxes are filed, the Debtor will ask the IRS to amend its claim or, failing such, will object to any surplus portion of the IRS' claim and endeavor to have the claim reduced. Regardless of whether or not this claim is ultimately reduced, however, the Debtor will pay the whole allowed amount of this claim within five years of the petition date. This will be accomplished by paying $100,000.00 prior to any distributions being made to general unsecured creditors, and paying an additional $20,615.94 on December 1, 2027 if the claim of the IRS has not been downwardly amended or otherwise reduced by court order prior to that date. The initial $100,000.00 of this claim will be paid only *after* retirement of the Class 6 claim of Lund Oil, Inc.

**Section 3.04   Statutory Fees**   There are no statutory fees due in this case.

**Section 3.05   Prospective Quarterly Fees**   There are no prospective quarterly fees that will be due in this case.

**Article 4.   Treatment of Claims and Interest Under the Plan**

| Class | Impairment | Treatment |
|---|---|---|
| Class 1 – Wells Fargo Bank, N.A. and First International Bank & Trust | Unimpaired | Class 1 consists of the mortgage claims secured against the Debtor's two real property assets. Neither of these mortgages were in default pre-petition and, save for a late payment post-petition that was made promptly upon the bank's attorney contacting the Debtor's counsel, both of these |

7

obligations have remained in good standing. The Debtor will continue to pay the promissory notes underlying these mortgages (totaling $5,687.35 per month), pursuant to their express terms, without modification. These payments will be made directly by the Debtor, and not by a disbursing agent under this Plan. The terms of the deeds of trust underlying these two obligations are not modified through this Plan. Any arrearages owed on either of these obligations, up to the sum of $1,092.51, shall be separately paid by the Debtor, to the correlative creditor, on or before the Effective Date.

| | | |
|---|---|---|
| Class 2 – Ford Motor Credit Company LLC | Unimpaired | This class consists solely of the claim of the Ford Motor Credit Company, LLC that is secured by the Debtor's Ford F-250. No default existed on the underlying promissory note pre-petition and, pursuant to an adequate protection order of this Honorable Court, payments have remained current during the pendency of this case. The Debtor will continue to make regular payments (being $1,750.00 per month), in accord with the terms of the promissory note. These payments will be made directly by the Debtor and not by any disbursing agent serving hereunder. |
| Class 3 – ACAR Leasing Ltd. d/b/a GM Financial Leasing | Impaired | This claim will be paid through ordinary course lease payments made directly by the Debtor, in accord with the terms of the underlying lease agreement. |

8

| | | |
|---|---|---|
| Class 4 – Non-priority, unsecured claims, excepting those expressly included in Class 3 (ACAR Leasing LTD d/b/a GM Financial Leasing) | Impaired | The holders of Class 4 claims will be paid, *pari passu*, after the Debtor pays the priority portion of the Class 1 claim herein. |
| Class 5 – Lund Oil, Inc. | Impaired | Lund Oil, Inc. has filed a secured claim in the amount of $87,936.63. The Debtor has indicated to Lund Oil, Inc., through counsel, that Mr. Glenn believes the security interest underlying this claim (the "Lund Oil Security Interest") to be avoidable pursuant to Section 547 of the Bankruptcy Code. The Debtor and Lund Oil, Inc. have agreed that in lieu of potentially expensive litigation over the issue, Lund Oil, Inc. shall have an allowed secured claim in the reduced amount of $65,000.00 in exchange for the Debtor agreeing to not seek to avoid the Lund Oil Security Interest, which shall be paid in full before the priority claim of the Internal Revenue Service, with said agreement being formalized through the confirmation of this Plan. |
| Class 6 – Equity interests in the Debtor | Unimpaired | Mr. Glenn shall retain his various assets, both real and personal, without regard to whether the same have been exempted herein. |

**Article 5.     Allowance and Disallowance of Claims**

**Section 5.01    Disputed Claim.** A *disputed claim* is a claim that has not been allowed or disallowed and as to which either: (i) a proof of claim has been filed or deemed filed, and the Debtor or another party in interest has filed an objection; or (ii) no proof of claim has been filed, and the Debtor has scheduled such claim as disputed, contingent, or unliquidated.

**Section 5.02    Delay of Distribution of Disputed Claims.** No distribution will be made on account of a disputed claim unless such claim is allowed by a final, non-appealable order.

**Section 5.03    Settlement of Disputed Claims.** The Debtor will have the power and authority to settle and compromise a disputed claim with court approval and compliance with Rule 9019 of the Federal Rules of Bankruptcy Procedure.

9

**Section 5.04   Anticipated Disputed Claims**. The Debtor has objected to various claims filed herein, with a hearing on said objections currently scheduled for August 15, 2023. The Debtor does not presently anticipate objecting to any other claims herein, but reserves his right to do so. Any such claim objection must be filed by the Debtor within ninety (90) days from the effective date of this Plan (as defined in Section 8.02 hereof), *except* any objection to the claim of the IRS may be filed at any time before the earlier of (i) the ninetieth (90th) day following the date on which the Debtor receives forms K-1, from Silver Fox, for the years 2021 and 2022; or (ii) the date on which the final payment hereunder is made. Should the claim of the IRS not be objected to, the Debtor shall preserve his right to seek a refund from the IRS for any overpayment of taxes actually due and owing, with this Plan *not* constituting a final adjudication of the Debtor's tax debt for any purpose other than the discreet function of these bankruptcy proceedings.

**Article 6.    Provisions for Executory Contracts and Unexpired Leases**

**Section 6.01   Assumption.** The Debtor assumes the executory contracts and unexpired leases set forth in lines 2.1 through 2.3 of Schedule G (as found at DE #34). The Debtor intentionally assumes the employment agreement set forth on line 2.2 of Schedule G, despite his having been since terminated, so as to preserve his claim against Silver Fox Energy, LLC (or, as such may be, that entity's receivership estate) for unpaid wages. The Debtor also assumes all executory contracts and unexpired leases for (i) the provision of utility services to any residence owned by the Debtor; (ii) the provision of utility services (including cellular phone services) to any member of the Debtor's immediate family; (iii) the provision of retirement benefits to the Debtor; (iv) the provision of merchant loyalty rewards, whether in the form of points, coupons, or otherwise, to the Debtor; and (v) the provision of insurance to the Debtor. The Debtor will cure any and all unpaid lease payments, owed pursuant to leases assumed herein, on or before the Effective Date.

**Section 6.02   Rejection.** The Debtor rejects all executory contracts and unexpired leases not assumed in Section 6.01 hereof.

**Article 7.    Means for Implementation of the Plan**

The primary means for implementing this Plan will be the Debtor's continued work. The Debtor was separated from his employment with Silver Fox during the pendency of this case but believes he will be able to continue to earn a salary of $150,000.00 per annum by working for a separate company. The Debtor has received expressions of interest in procuring his services, from third parties, on comparable payment terms, and will seasonably accept one such offer. Should the Debtor not do so, he will endeavor to ply his trade through Glenn LLC, an entity he owns with his non-filing spouse; he reasonably believes he can draw a salary of $150,000.00 per annum from Glenn LLC if he works for the entity and, equally, that his work for the entity would invite increased revenues sufficient for such a salary to be paid over and above the distributions he anticipates receiving from that entity.

The Debtor also holds claims against the receivership estate of Silver Fox, both for indemnification/contribution and for unpaid wages. The Debtor is moving to employ counsel to pursue these claims. If such application is granted, the Debtor will pursue these claims and use the proceeds – if any – to make payments hereunder. The Debtor does not, however, believe it

reasonable to project that these claims will yield funds available to creditors herein, as it appears (i) Silver Fox is deeply insolvent; (ii) the receivership estate is heavily burdened by putatively secured claims; and (iii) the receivership estate may persist for a period of time beyond the five year horizon of this Plan.

As noted *supra*, the Debtor will make a payment of $15,000.00, per calendar quarter, to the disbursing agent under this Plan. This payment will be in addition to – and not in lieu of – the Debtor making regular installment payments to the holders of Class 1 and Class 2 claims. The first such payment will be made on December 1, 2023. Ensuing payments will be made on the first business days of each March, June, September, and December, to and through July 1, 2028, *except* no payments shall be made once all allowed claims are paid hereunder.

The Debtor will be free to make prepayments under this Plan. Should he do so, the amount paid early – whether as a freestanding payment or in addition to the full sum of a prior payment – shall be credited against the Debtor's next-scheduled payment hereunder. If a pre-payment is larger than the next scheduled payment, such prepayment shall be credited against ensuing payment obligations, in chronological order from the date of said prepayment, until the prepaid sum is exhausted.

The disbursing agent may distribute monies hereunder in the time and manner he deems most fit, *provided*, the disbursing agent shall distribute monies to creditors, in accord with the provisions of this Plan, not later than the sixtieth (60th) day on which he receives said monies, and the disbursing agent shall distribute the full sum of monies he receives under this Plan except for those monies reasonably necessary to cover the disbursing agent's fees and expenses, as discussed *infra*.

**Article 8.     General Provisions**

**Section 8.01    Definitions and Rules of Construction.** The definitions and rules of construction set forth in §§ 101-02 of the Bankruptcy Code shall apply when terms defined or construed in the Bankruptcy Code are used in this Plan.

**Section 8.02    Effective Date.** The effective date of this Plan is the first business day following the date that is 14 days after the entry of the confirmation order. If, however, a stay of the confirmation order is in effect on that date, the effective date will be the first business day after the date on which the stay expires or is otherwise terminated.

**Section 8.03    Severability.** If any provision in this Plan is determined to be unenforceable, the determination will in no way limit or affect the enforceability and operative effect of any other provision of this Plan.

**Section 8.04    Binding Effect.** The rights and obligations of any entity named or referred to in this Plan will be binding upon, and will inure to the benefit of, the successors, assigns and/or receiver(s) of such entity.

**Section 8.05    Default.** Should there occur a default under this Plan, creditors will have all rights provided for in the Bankruptcy Code (including Section 1112 thereof, inclusive of its allowances for the bringing of a motion to convert this proceeding to one under Chapter 7 of the Bankruptcy

11

Code) as well as the right to seek recourse for breach of contract together with such remedies as this Honorable Court may deem just and proper, sitting as a court of equity; such rights will also vest in any interested parties with Article III standing to pursue such rights. A default hereunder shall be deemed to occur if the Debtor fails to make any payment provided for by this Plan, in the full amount so provided, and does not cure such failure within thirty (30) days of being given written notice of said failure by a party in interest.

**Section 8.06   Disbursing Agent.** There shall be no disbursing agent hereunder and the Debtor will make all payments to creditors directly, by check or, where available, direct deposit or auto-debit.

**Section 8.07   Captions.** The headings contained in this Plan are for convenience of reference only and do not affect the meaning or interpretation of this Plan.

**Section 8.08   Controlling Effect.** Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code or the Federal Rules of Bankruptcy Procedure), the laws of North Dakota govern this Plan and any agreements, documents, and instruments executed in connection with this Plan, except as otherwise provided in this Plan.

**Section 8.09   Escheat.** If any distribution remains unclaimed for a period of 90 days after it has been delivered (or attempted to be delivered) in accordance with the Plan to the holder entitled thereto, such unclaimed property shall be forfeited by such holder.  Unclaimed property shall be (i) first paid to other members of the class of the claimant not claiming said distribution, until such a time as said class is paid in full; and (ii) then, if and when such class is paid in full, remaining funds shall be donated to the University of Miami School of Law Bankruptcy Clinic, to be administered by Patricia Redmond, Esq. in the charitable manner she sees most fit. The University of Miami School of Law Bankruptcy Clinic works with members of the South Florida legal community to provide *pro bono* services to persons in need of bankruptcy relief, while also furnishing law students with valuable pedagogical experience in the field of bankruptcy law.

**Section 8.10   Retention of Jurisdiction.** The United States Bankruptcy Court for the District of North Dakota shall retain jurisdiction of this Chapter 11 case to issue orders necessary to the consummation of the Plan; to determine the allowance of compensation and expenses of professionals; to determine any and all adversary proceedings, applications and contested matters; to determine issues or disputes relating to the assumption of executory contracts and any claims related thereto; to determine disputes as to classification or allowance of claims or interests; to issue such orders in aid of execution of this Plan to the extent authorized by § 1142 of the Bankruptcy Code; to enforce the provisions of the Plan; to recover all assets of the Debtor and property of the Debtor's estate, wherever located; to resolve any dispute between or among any of the parties to this bankruptcy proceeding, to determine other such matters as may be set forth in a confirmation order or as may be authorized under the provisions of the Bankruptcy Code; to enter a final decree closing the bankruptcy case; and to correct any defect, cure any omission or reconcile any inconsistency in this Plan or confirmation order, and to take any action or make any ruling as may be necessary to carry out the purpose and intent of this Plan.

**Section 8.11   Modifications.** The Debtor may, with the approval of the Bankruptcy Court and without notice to holders of claims, correct any nonmaterial defect, omission, or inconsistency

herein in such manner and to such extent as may be necessary or desirable. The Debtor may also amend this Plan in any manner that renders the terms hereof *more* favorable to creditors, with the approval of the Bankruptcy Court and without notice to holders of claims.

**Section 8.12**   **[Intentionally Omitted]**

**Article 9.**   **Discharge**

**Section 9.01**   **Discharge.** Discharge shall be in accord with the Bankruptcy Code.

**Section 9.02**   **Effect of Discharge.** This discharge will be effective against all creditors of the Debtor given notice of this bankruptcy case and sent a copy of this Plan, together with their respective members, managers, insiders, shareholders, officers, directors, trustees and receivers.

**Article 10.**   **Retention of Certain Assets; Notice of Substantial Consummation**

**Section 10.01**  Pursuant to Section 1123(b)(3)(B) of the Bankruptcy Code, all rights arising under Chapter 5 of the Bankruptcy Code shall remain an asset of the Debtor's bankruptcy estate – and shall, accordingly, remain subject to the protections of Section 362(c)(1) of the Bankruptcy Code – to and through December 1, 2027, at which time said interest (should any remain) shall revest in the Debtor.

**Section 10.02**  If the Plan is confirmed under 11 U.S.C. § 1191(a), the Debtor will file a Notice of Substantial Consummation not later than 14 days after the Plan is substantially consummated per 11 U.S.C. § 1183(c)(2).

    Respectfully Submitted,

    /s/ Maurice B. VerStandig
    Maurice B. VerStandig, Esq.
    THE DAKOTA BANKRUPTCY FIRM
    1630 1st Avenue N
    Suite B PMB 24
    Fargo, North Dakota 58102-4246
    mac@dakotabankruptcy.com
    *Counsel for the Debtor*